**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA : | |
| : | Criminal Action No. 04-657 (FLW) |
| v. : | |
| : | **MEMORANDUM OPINION** |
| RODNEY KEMP : | |

This matter comes before the Court upon Defendant Rodney Kemp's ("Kemp" or "Defendant") motion to suppress evidence seized by the Cherry Hill Police Department when he was pulled over for an alleged broken tail light, and a subsequent search of his person uncovered a loaded .380 caliber handgun. Kemp alleges that his tail light was not broken at any time prior to the traffic stop, and that the warrantless search of his person violated his Fourth Amendment rights because the police did not have the requisite probable cause to conduct the search.[1] An evidentiary hearing was held on March 3, 2005 and April 22, 2005, at which time, Defendant and Cherry Hill Police Department Officer Mark Buehler ("Buehler") and Sergeant Kevin Wright

---

[1] Originally, Kemp also moved to suppress the statement he made in the police car indicating that he had purchased the gun for his protection. See Def. Br. at 3; Govt. Br. at 7. Kemp initially alleged that he was never advised of his Miranda rights and thus such statement was made involuntarily and in violation of his Fifth and Sixth Amendment rights. See Def. Br. at 3-5. However, during the evidentiary hearing held on April 22, 2005, Defendant testified that he did not say anything to the police officer on the way to the police station. See Unoff. Tr. 4/22/05, at 26-27. Specifically, Defendant testified that he did not mention where he got the gun. Id. at 26. Under Miranda v. Arizona, 384 U.S. 436, 444 (1966), certain prophylactic warnings must be administered when an individual is in police custody and before an individual is subject to police interrogation. Here, Defendant's counsel conceded that there was no custodial interrogation of Defendant in the police car. Unoff. Tr. 4/22/05, at 53-54. Therefore, on the facts of this case, the Court finds that Defendant's only remaining claim is his argument that the police officers engaged in an unreasonable search and seizure of his person in violation of his Fourth Amendment rights, and if so, then the fruits of that search should be suppressed.

1

("Wright") testified. For the reasons stated below, Kemp's motion to suppress the handgun is denied.

I. BACKGROUND

Defendant was charged in a one-count indictment with being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 922(g)(1) and (2). On February 7, 2004, at approximately 1:05 a.m., Buehler, a police officer with the Cherry Hill Police Department for 10 years, was on routine patrol when he observed Defendant's car traveling east-bound on Park Boulevard in Cherry Hill Township. See Tr. 3/3/05, at 12-13. According to Buehler, he was approximately 30-40 yards behind Defendant's car when he noticed that one of Defendant's tail lights was cracked. Id. at 13. Buehler recognized the cracked tail light to be a violation of the New Jersey Motor Vehicle Code. Id. at 14. Defendant, on the other hand, denies that his tail light was cracked or broken. See Unoff. Tr. 4/22/05, at 28-29. Buehler initiated a traffic stop and Defendant's car came to a stop without incident at the Parkview Motel. Tr. 3/03/05, at 15. Buehler testified that in his 10 years with the police department, he had witnessed "multiple arrests for prostitution, narcotics, and other weapon offenses" at the Motel. Id. at 15-16. Buehler further testified that he had heightened awareness by being in such a high-crime area. Id. at 16.

Sergeant Wright, a police officer with the Cherry Hill Police Department for 14 years, was also on patrol when he observed Buehler initiate the traffic stop on Defendant's vehicle. Id. at 63-64. Wright drove to the scene of the stop. Id. at 64. As Buehler approached Defendant's car from the driver's side, Wright came up to the vehicle on the passenger's side. Id. at 65. Wright testified that he also observed that Defendant's driver's side tail light was broken. Id.

Upon reaching the car, Buehler and Wright noticed that there were two women in the back

2

seat of Defendant's car. Id. at 17, 66. Buehler then asked Defendant for his license, registration and insurance documentation. Id. at 19. According to Buehler, at this point, Defendant became extremely anxious and started to fumble between the front and back seats of the car. Id. Defendant ultimately gave Buehler his registration and insurance cards, but Buehler testified that he did not receive Defendant's driver's license. Id. at 21. Defendant, however, claims that he handed over all his documentation, including his license. Unoff. Tr. 4/22/05, at 9, 14. Buehler also claims that he had difficulty seeing inside Defendant's car because trash and paperwork were strewn all over the floor. Tr. 3/03/05, at 19-20. Buehler further testified that he was unable to see Defendant's hands because Defendant kept turning to his side with his hands "between the console where he was continuing to search for something else." Id. at 20. Buehler then instructed Defendant to stop moving at least two to three times. Id. at 21. According to Buehler, he gave Defendant such instructions because he was trying to secure his own safety and "making sure [Defendant] wasn't trying to attempt to conceal something." Id. at 23. Although Defendant initially complied with Buehler's instructions, he continued to turn back to the rear seat and appeared to be searching for something. Id. at 21, 67. Wright also testified that while Defendant was seated in the car, Buehler asked him "repeatedly to stop turning around," id. at 67, but that Defendant was "extremely anxious," made "a lot of movement," and "kept turning around to the back of the vehicle ... [and] appeared to be abnormally agitated." Id. at 66. Wright further stated that while seated in his car, Defendant went toward his pocket at least three times to adjust something. Id. at 68. Buehler then asked Defendant the identities of the two women in his back seat. Defendant was unable to answer and twice looked over his shoulder "as to elicit a response from [the women]." Id. at 22. According to Buehler, at this point, Defendant became argumentative and the tone of Defendant's voice became increasingly loud as Buehler questioned

3

him. Id. at 23-24. Defendant, however, denies that he ever raised his voice to the police officers. Unoff. Tr. 4/22/05, at 18. Buehler testified that due to Defendant's erratic behavior, he instructed Defendant to step out of the vehicle; however, Defendant again became argumentative and started to reach out for the registration card that Buehler held in his hand. Tr. 3/03/05, at 22.

According to Buehler, Defendant reached into his right jacket pocket as he exited his car. Id. at 24. Defendant, on the other hand, testified that his hands were merely hanging by his sides at this point. Unoff. Tr. 4/22/05, at 21, 45. Wright also testified that as Defendant got out of the car, Defendant "kept on attempting to adjust something in his jacket pocket," and "kept on looking down ... to that area." Tr. 3/03/05, at 67. Wright then saw a black plastic convenience store bag and "a definite bulge" in Defendant's pocket. Id. Wright stated that at this point, his "concern for [his own] safety was extremely high," id. at 68, because the bulge could have been consistent with a weapon. Id. at 69. Buehler then instructed Defendant to remove his hand from his pocket, and although Defendant initially complied with this order, Defendant proceeded to walk toward Buehler and attempted to reach into his pocket again. Id. at 25. At this point, Buehler also noticed a black plastic bag hanging out of Defendant's pocket. Id. Buehler testified that in his experience, such bags were used for carrying narcotics and other criminal contraband. Id. As Buehler and Defendant were standing on the driver's side of Defendant's car, Wright came around from the back of the vehicle and reached forward from behind Defendant. Id. at 26, 68. Wright also instructed Defendant to keep his hands out of his pockets, but Defendant immediately put his hand back in his pocket and replied that "there was nothing in [t]here." Id. at 70. Wright then touched Defendant's front right jacket pocket and Defendant "clinched down on the pocket with his elbow," id. at 26, and "lower[ed] his stance in an aggressive manner ...." Id. at 71. At that point, Wright grabbed Defendant's right hand and Buehler reached forward and

grabbed his left hand. Id. at 26. Buehler testified that they placed Defendant in a compliance hold in order to prevent him from possibly retrieving a weapon from his jacket pocket. Id. at 53. The officers testified that even while restrained, Defendant continued to struggle and kick and even attempted to reach inside his pocket again. Id. at 27, 71. Defendant, however, denies that he kicked, pushed, or touched the officers in any way. Unoff. Tr. 4/22/05, at 18-19. When Wright and Buehler finally obtained control of Defendant's arms, they brought him to the rear of his vehicle where another police officer, Officer Tedesco, arrived on the scene and upon Wright's instruction, removed the plastic bag from Defendant's right jacket pocket and took out a loaded .380 caliber handgun. Tr. 3/03/05, at 72-73. At no time during this incident, however, did Buehler or Wright inform Defendant that they were going to conduct a pat-down of his person. Id. at 44.

Defendant's vehicle was then towed to the impound lot where no inventory was made or photographs taken of Defendant's car. Id. at 59-60. Indeed, Defendant's counsel acknowledged during the evidentiary hearing that there are no records detailing the condition of Defendant's car at the time of his arrest. Unoff. Tr. 4/22/05, at 2-3.

In the evidentiary hearing, Defendant testified that prior to picking up the two women in his car and being pulled over for the traffic stop, he gave a ride to two men in exchange for money. Id. at 11. Defendant claims that these men left the plastic bag containing the gun in his car and that he discovered the bag shortly before he picked up the two women. Id. at 11-12. However, Defendant contends that he did not look inside the bag and merely put the bag in his pocket. Id. at 12. In addition, Defendant claims that he never lifted his hand toward his right pocket when he exited his car upon Buehler's instructions. Id. at 46-47. According to Defendant, neither Buehler nor Wright attempted a pat-down of his clothing, but merely "[threw him] on the

car and just went in [his] pocket." Id. at 17.

## II.     DISCUSSION

### A.     Controlling Fourth Amendment principles

The Fourth Amendment of the United States Constitution mandates that searches and seizures of an individual, the individual's home, papers, or effects be conducted pursuant to a warrant. See U.S. Const. Am. IV; see also Terry v. Ohio, 392 U.S. 1, 20 (1968); Katz v. United States, 389 U.S. 347 (1967). Under the Fourth Amendment, a traffic stop is lawful where a police officer observes a violation of state traffic regulations. See United States v. Moorefield, 111 F.3d 10, 12 (3d Cir.1997) (citing Pennsylvania v. Mimms, 434 U.S. 106, 109 (1977)). The constitutional reasonableness of a traffic stop does not depend on actual motivations of the individual police officers involved. See Whren v. United States, 517 U.S. 806, 813 (1996). In addition, under Terry, a police officer may conduct a reasonable search for weapons for his own protection without violating the Fourth Amendment's prohibition against unreasonable searches and seizures "where he has reason to believe that he is dealing with an armed and dangerous individual." Terry, 392 U.S. at 27. However, a brief investigative stop is a "seizure" subject to Fourth Amendment protection and a search conducted in connection with such "seizure," including a pat-down for weapons, can occur only where the officer is "able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." Id. at 21. The test is "whether a reasonably prudent [person] in the circumstances would be warranted in the belief that his safety or that of others was in danger." Id. at 27 (citations omitted). This determination of reasonableness, under the totality of circumstances, may include an assessment of a detainee's "location, a history of crime in the area,

[a detainee's] nervous behavior and evasiveness, and [the police officer's] 'commonsense judgments and inferences about human behavior.'" Johnson v. Campbell, 332 F.3d 199, 206 (3d Cir.2003) (quoting Illinois v. Wardlow, 528 U.S. 119, 124-25 (2000)). The rationale of Terry has been extended to traffic stops in order to "minimize the dangers police officers routinely face ..." in such situations. United States v. Kithcart, 218 F.3d 213, 219 (3d Cir.2000). Furthermore, the Third Circuit has held that under Maryland v. Wilson, 519 U.S. 408 (1997), the police can conduct a limited weapons pat-down of a passenger of a lawfully stopped car so long as Terry's constitutional requirements are met. See Moorefield, 111 F.3d at 13-14. In such situation, the police officer "need not be absolutely certain the individual is armed," so long as the officer's concern is objectively reasonable. Id. at 14. Moreover, under Mimms, a police officer can order the driver out of a lawfully stopped car. See Mimms, 434 U.S. at 111. However, after an initial investigatory stop and questioning regarding suspicious behavior, "any further detention or search must be based on consent or probable cause." United States v. Brignoni-Ponce, 422 U.S. 873, 882 (1975).

### B. Tail light issue

The parties here present conflicting testimony as to whether Defendant's tail light was broken or cracked at the time of the traffic stop. Without photographs or other objective evidence showing the condition of Defendant's car, the Court finds that the tail light issue is one of credibility, and on this point, the Court finds that the police officers were credible in their testimony. Buehler testified that he was 30 to 40 yards away from Defendant's vehicle when he noticed the cracked tail light. Wright also testified that he saw the cracked tail light as he walked up the passenger's side of Defendant's car. Defendant's testimony, on the other hand, is not entirely clear about the condition of the tail light. For instance, Defendant testified that in

7

response to the officer's statement to him that a hairline crack in his tail light allowed "a little bit of white [light] through the red ...", Defendant replied that "the lights weren't broken to [him] ...." Unoff. Tr. 4/22/05, at 29. Defendant merely stated that "[t]he lights w[ere] on." Id. These statements by Defendant are not definitive as to whether the tail light was cracked or broken. Defendant could have meant there was nothing wrong with his tail light because the tail light's cover was not completely broken and the light itself was functioning. Furthermore, although Defendant argues that there is no evidence to corroborate the officers' testimony since no inventory was made or photographs taken of Defendant's car, once the Court finds the officers' testimony credible, it does not require independent corroborative evidence to support its credibility determination. Thus, the Court finds that the Government has satisfied its burden of proving by a preponderance of the evidence that the traffic stop was proper. See United States v. Matlock, 415 U.S. 164, 177 (1974).

### C.    Fourth Amendment analysis

Defendant argues that the police officers' actions of reaching into his pocket and removing the plastic bag without first frisking the outer surface of his clothes did not constitute a Terry pat-down, but instead was a full-blown search of his person conducted without probable cause and in the absence of exigent circumstances. This Court, while mindful of the Constitutional prohibition against unreasonable searches and seizures, must determine whether the totality of circumstances surrounding the traffic stop justified the particular intrusion upon Defendant's right to personal security. After reviewing the parties' papers and hearing the testimony of the police officers and Defendant at the evidentiary hearing, the Court finds that the search of Defendant was reasonable under the Fourth Amendment and that the handgun seized

pursuant to the search may properly be introduced into evidence.[2]

When conducting a Terry traffic stop, an officer who reasonably believes that a detainee is armed and could gain immediate control of a weapon may search for the weapon and separate the detainee from any weapon found. See Terry, 392 U.S. at 24-26. An officer need not be certain that an individual is armed; the pertinent issue is whether a reasonably prudent person in the circumstances would be warranted in the belief that his safety or that of others was in danger. See id. at 27. Such search normally involves a pat-down or a frisk prior to reaching into a detainee's pocket. Here, a Terry pat-down did not occur because the police officers did not engage in an actual frisk of Defendant's outer clothing prior to reaching in Defendant's pocket and removing the plastic bag. However, both officers actually saw a bulge in the pocket and a plastic bag hanging out of it. See Tr. 3/03/05, at 25, 67. Buehler testified that in his experience, such bags were used for carrying narcotics and other criminal contraband. Id. at 25. Wright stated that he thought the lump in Defendant's pocket was consistent with the shape of a weapon. Id. at 69. In addition, both officers testified that Defendant's actions made them concerned about their own safety. Id. at 23, 68-69. These observations, combined with the high-crime area in which the traffic stop occurred and Defendant's suspicious behavior, including (i) his furtive hand movements while inside the car, (ii) his repeated attempts to reach inside his pocket even after

---

[2] The Court notes that in a letter dated February 14, 2005, Defendant claims that he was the subject of racial profiling when he was pulled over for the traffic violation. This claim is without merit. First, there is no evidence in the record demonstrating that Defendant was stopped based purely on his race. Furthermore, since the Court has already made a credibility determination regarding the condition of Defendant's tail light at the time of the traffic stop, Defendant's allegations of bad motivations on the part of the police officers does not invalidate the initial stop. See Whren, 517 U.S. at 813 (stating that constitutional reasonableness of traffic stop does not depend on actual motivations of individual officers involved); see also United States v. Santos, 340 F.Supp.2d 527, 534 (D.N.J. 2004) (stating that stop's legality must be based on objective factors available to officers at the time, and not on individual officer's subjective intent (citing United States v. Hawkins, 811 F.2d 210, 214 (3d Cir.1987)).

being instructed several times not to do so, (iii) his statement that there was nothing in his pocket despite the fact that both officers saw a black bag hanging out of it, and (iv) his "clinching down" on that pocket when Wright reached forward to it, constituted the "specific and articulable facts which, taken together with rational inferences from those facts" reasonably warranted the search. In other words, not only was it reasonable for the officers to conduct a Terry pat-down, but there was also probable cause to search Defendant's pocket because the circumstances were sufficient to warrant a man of reasonable prudence in the belief that contraband or other evidence of a crime would be found on Defendant's person.

Probable cause exists where there are "objective facts that could justify the issuance of a warrant by a magistrate," United States v. Ross, 456 U.S. 798, 807 (1982), *i.e.* facts that suggest there is a "fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983). Furthermore, "probable cause," as the Supreme Court has stated, is a "common sense, nontechnical conception[] that deal[s] with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Ornelas v. United States, 517 U.S. 690, 695 (1996) (internal quotations and citations omitted). This Court is mindful of the dangerous situations in which the police and citizens confront each other on the street. Here, given Defendant's furtive and erratic behavior and his continued noncompliance with the officers' orders to keep his hands out of a pocket that contained a suspicious bag, the officers had probable cause to believe that either Defendant was armed and dangerous and attempting to reach a concealed weapon, or possessed some sort of contraband in his pocket.

### III. CONCLUSION

For the foregoing reasons, Kemp's motion to suppress the evidence obtained as a result of the search conducted of his person during a traffic stop on February 7, 2004 is denied.

Date: May 3, 2005

Honorable Freda L. Wolfson
United States District Judge